[Civ. No. 4455.   Fourth Dist.   Dec. 12, 1952.]

H. T. GOODWIN, Appellant, v. ELWOOD ALSTON
et al., Respondents.

714

Albert Lee Stephens, Jr., Feinfeld & Feinfeld and Guy Richards Crump for Appellant.

Best, Best & Krieger and Arthur L. Littleworth for Respondents.

MUSSELL, J.—In this action, commenced on October 13, 1949, to foreclose two trust deeds and crop mortgages, defendants M. A. Fleming, Josie Bell Fleming and James M. Fleming filed an answer and cross-complaint in which they claimed treble damages because of alleged usury. This answer and cross-complaint was superseded by an answer and counterclaim in which counterclaim usury was charged and treble damages therefor were sought in the total sum of $82,394.70. Two transactions were involved. In the first, Goodwin advanced to Fleming $40,000 and in the second $65,000. A jury was empaneled to determine whether these transactions were loans, as claimed by the Flemings, or sales of commercial paper, as claimed by plaintiff Goodwin. The jury rendered verdicts that both transactions were loans. The other issues were tried by the court and a judgment was rendered that plaintiff Goodwin had no right, title or interest in the notes or deeds of trust securing them, or in the crop mortgages executed in connection therewith and that the Flemings were entitled to judgment against Goodwin in the sum of $50,293.62 and costs, amounting to $580. Goodwin, who had advanced $105,000 and had received payments thereon in the sum of $85,639.82 was thereby obligated to pay a judgment in the sum of $50,873 in addition to the loss of the difference between moneys advanced by him and repaid to him in the sum of $19,631.

The evidence is conflicting as to the nature of the transactions involved. Moses A. Fleming, who was an attorney, testified that he had several conversations with plaintiff Goodwin beginning in December, 1947, concerning the advance of money to be made by Goodwin; that in 1947 he told Goodwin that he was growing potatoes and needed money for that purpose; that he had some good security, a $50,000 note, and

would put it up to get $40,000; that Goodwin said he would see the property and consider it; that later Goodwin stated he would make the loan if Fleming would give him $10,000 extra, besides the $40,000; that Fleming told Goodwin the loan would be repaid when the potato crop was harvested sometime in August; that this arrangement went to escrow and Fleming arranged to pay Goodwin by giving orders on Barney Cornett, a potato grower.

The record shows that the land in Riverside county upon which the potatoes were grown, and to be grown, at this time was owned by Elwood Alston and his wife. The Alstons, on December 12, 1946, had executed a promissory note in favor of M. A. Fleming and James Fleming for the sum of $50,000, secured by a trust deed on the property. The note and trust deed was assigned by Fleming to Goodwin and a crop mortgage executed by the Alstons to Goodwin as additional security for the $50,000 note.

It is admitted that Goodwin received $51,544.90 from the potato broker in payment of the $40,000 advanced.

Fleming further testified that sometime in August, 1948, he had another conversation with Goodwin in which he told Goodwin that they (Flemings and Alstons) needed $65,000; that Alston had so many debts they had to have more money; that he, Fleming, told Goodwin he would give him the same security he had already given him in the $40,000 deal and he would give him $20,000 extra on the property; that Goodwin stated he would advance $65,000 to Fleming and would require a crop mortgage for $70,000, in addition to the trust deeds, and potato bonus consisting of the proceeds of 4,000 sacks of number one potatoes; that he told Goodwin he and the Alstons would pay the money back out of the harvest and that it might run over into the next year. A second promissory note for $20,000 was executed by the Alstons, secured by a trust deed and the two trust deeds, and a crop mortgage for $70,000 were executed by the Alstons to Flemings and by the Flemings assigned to Goodwin. The $65,000 was advanced by Goodwin and Goodwin thereafter received through the potato broker, in March-April, 1949, $34,094.92, which sum included a potato bonus of $15,958.

The record shows that the Alstons conveyed a one-half interest in the real property on which the potatoes were grown to Fleming on September 9, 1948, and the remaining one-half

on February 26, 1949, and that all the moneys received by Goodwin in both of the transactions involved were through the potato broker on orders drawn upon him. The Flemings did not sign any written document agreeing to repay Goodwin the sums advanced by him.

Goodwin's testimony concerning these two transactions was that in December, 1947, he had a conversation with Fleming in which Fleming stated that he had a trust deed on a ranch near Perris on which he was growing potatoes; that he wanted to sell the trust deed and was expecting to discount the note and trust deed; that he, Goodwin, stated he wanted to look at the ranch; that he went to see it and was shown the records of the profits therefrom; that he wanted to be sure the crop would pay off the trust deed before he bought it; that a 20 per cent discount was agreed upon and the parties went into escrow; that he deposited the sum of $40,000 and received a $50,000 trust deed and note signed by Mr. and Mrs. Alston, endorsed by the Flemings and received a crop mortgage on the crop that was either planted or about to be planted, and also received an order signed by Alstons to the potato broker to pay the amount of the note; that he did not lend any money to Fleming but purchased a trust deed and note on which he subsequently received the sum of $51,544.90; that early in September, 1948, Fleming told him that Alston owed him a lot of money; that he needed some cash; that when the original trust deed and note was reassigned to him, he was going to sell it and he was also getting an additional $20,000 trust deed and note; that he asked Goodwin if he would be interested in buying them and stated he would give the same discount as on the $50,000 note and trust deed executed in March; that Alston was going to farm more land and that the report from the broker was that potatoes were going to be high and Alston would easily be able to pay the $70,000 with the crop that was going on in September; that he, Goodwin, advanced $65,000 to Fleming and received the $50,000 trust deed and note, the $20,000 trust deed and note and the crop mortgage for $70,000; that at the time the second transaction was consummated, Goodwin agreed to purchase 4,000 sacks of potatoes at $2.50 a sack, so that he, Goodwin, paid $55,000 for the trust deeds and paid $10,000 for the potatoes; that subsequent to this second transaction he received through the potato broker $15,958 for the potatoes and the further sum of $8,174.92 in March, 1949, and $9,962 in April.

The judgment of the trial court was computed as follows:

"COMPUTATION OF JUDGMENT

Goodwin owes Fleming on counter-claim:

| | | |
|---|---|---|
| Treble interest paid on first loan .. | $34,634.70 | |
| Treble potato bonus on second loan . | $47,874.00 | |
| Treble interest and cash bonus paid on second loan ................. | $21,972.00 | |
| | | $104,830.70 |

Fleming owes Goodwin on second loan the sum of $65,000.00 reduced by $10,812.92 being the amount already credited and paid

| | | |
|---|---|---|
| $54,187.08 | | $ 54,187.08 |
| Balance due from Goodwin to Fleming ................. | | $ 50,293.62" |

The trial court in arriving at the amount set forth in the last item in the computation ($21,972) applied the two payments made in March and April amounting to $18,136.92, as follows: $10,812.92 on the principal of the $65,000 obligation, and the balance of the payment in the amount of $7,324 to the $5,000 cash bonus and accrued interest of $2,324 on the $70,000 to the date of payment. The $7,324 payment, when trebled, equals $21,972. ■ Appellant Goodwin rightly contends that the court erred in not properly allocating payments between interest and principal. On May 5, 1949, in a statement in writing rendered to Fleming, Goodwin allocated $17,463.59 to principal and the balance to interest (plaintiff's exhibit 8).

Section 1479 of the Civil Code provides as follows:

"[Application of general performance.] Where a debtor under several obligations to another, does an act, by way of performance, in whole or in part, which is equally applicable to two or more of such obligations, such performance must be applied as follows:

"One. *(Application by debtor.)* If, at the time of performance, the intention or desire of the debtor that such performance should be applied to the extinction of any particular obligation, be manifested to the creditor, it must be so applied.

"Two. *(Application by creditor.)* If no such application be then made, the creditor, within a reasonable time after

such performance, may apply it toward the extinction of any obligation, performance of which was due to him from the debtor at the time of such performance; except that if similar obligations were due to him both individually and as a trustee, he must, unless otherwise directed by the debtor, apply the performance to the extinction of all such obligations in equal proportion; and an application once made by the creditor cannot be rescinded without the consent of [the] debtor.

"Three. *(Application in absence of designation.)* If neither party makes such application within the time prescribed herein, the performance must be applied to the extinction of obligations in the following order; and, if there be more than one obligation of a particular class, to the extinction of all that class, ratably:

"1. Of interest due at the time of the performance.

"2. Of principal due at that time.

"3. Of the obligation earliest in date of maturity.

"4. Of an obligation not secured by a lien or collateral undertaking.

"5. Of an obligation secured by a lien or collateral undertaking."

The record shows that the payments totaling $18,136.92 were made without designation by Fleming or Alstons as to how they were to be applied, and since Goodwin allocated $17,463.59 of that sum to principal, the court had no authority to allocate such sum to interest. The evidence shows that the check to Goodwin for $15,920 was issued without instructions as to its allocation. The endorsement thereon by Goodwin "Payment account Alston-Fleming ranch for 4,000 sx potatoes as per assignment" does not indicate that Goodwin was accepting this money as interest and indicates that he was applying it to the transaction in which he purchased the potatoes.

Appellant argues that "since the payments made to plaintiff in connection with the first transaction were made in August and September, 1948, and the answer and cross-complaint was not filed until December, 1949, treble damages cannot be recovered based upon such payment." Appellant states that only one "loan" was originally contemplated; that only one "loan" was originally made, this being the loan of $40,000 made on or about March 8, 1949; that not until five months later was there any discussion with respect to a further loan; that the first loan of $40,000 was repaid in

two installments, the sum of $25,000 on or about August 16, 1948, and the further sum of $26,544.90 on or about September 11, 1948; that the second and last payment on the original loan was made contemporaneously with the making of the second loan for $65,000. These statements are borne out by the record. In this connection it should be noted that the $40,000 advance was treated as one transaction in the interrogatories submitted to the jury and the $65,000 advance as another, and that the jury by its verdict found that each of these transactions constituted a loan.

The first paragraph of section 3 of Act 3757 (Usury Law) 2 Deering's General Laws of 1944, page 1350, provides as follows:

"Every person, company, association or corporation, who for any loan or forebearance of money, goods or things in action shall have paid or delivered any greater sum or value than is allowed to be received under the preceding sections, one and two, may either in person or by his or its personal representative, recover an action at law against the person, company, association or corporation who shall have taken or received the same, or his or its personal representative, treble the amount of the money so paid or value delivered in violation of said sections, providing such action shall be brought within one year after such payment or delivery."

In *Kurzman* v. *Commercial Credit Co.*, 33 F.2d 358, 359, the court, in construing this statute, said:

"The usury law is a special law, conferring a special right of action to recover interest unknown to the common law. The statutory period within which such action may be brought is not, strictly speaking, a statute of limitations. It is rather a statute of creation, which brings the right of action into life for a certain period, and extinguishes it absolutely at the expiration of that period. Such a statute is not affected by the general rules as to the tolling of the statute of limitations, and failure to discover the usury cannot prolong the life of the cause of action created and given one year's life by the statute. 37 Cyc. 686; *Partee* v. *St. Louis & S. F. R. Co.* (C.C.A.) 204 F. 970, 51 L.R.A. (N.S.) 721."

Respondents contend that appellant waived the statute of limitations as to the counterclaim by failing to invoke it at the time of trial, and that he cannot invoke it for the first time on appeal. (*Citing Union Sugar Co.* v. *Hollister Estate Co.*, 3 Cal.2d 740 [47 P.2d 273].) That case does not involve the construction of the usury statute and it is there

stated that where the answer to a complaint sets up any matter constituting an affirmative cause of action or counterclaim, such new matter is deemed controverted under the provisions of section 462 of the Code of Civil Procedure, and the adverse party may, without formal plea, show that the attempted defense is barred by the statute of limitations, and that the statute is deemed pleaded by operation of law.

In *Stock* v. *Meek*, 35 Cal.2d 809, 816-817 [221 P.2d 15], the court, in interpreting the one year limitation of the Usury Law, *supra,* said:

"The Usury Law provides that any person who pays interest at a usurious rate may recover treble the amount paid, 'providing such action shall be brought within one year after such payment or delivery.' It is settled that this section did not abrogate any common law rights of borrowers as parties to an illegal contract, but merely added a statutory remedy to aid the borrower and penalize the lender. (*Westman* v. *Dye,* 214 Cal. 28 [4 P.2d 134]; *Taylor* v. *Budd,* 217 Cal. 262 [18 P.2d 333].) Borrowers may therefore bring an action for money had and received to recover usurious interest paid within two years of the suit. (*Babcock* v. *Olhasso,* 109 Cal. App. 534 [293 P. 141]; Code Civ. Proc., § 339(1).) Since the overpayment occurred on January 12, 1946, and the complaint was filed March 26, 1947, defendants are not barred from setting up a counterclaim to recover the interest. (*Jones* v. *Mortimer,* 28 Cal.2d 627, 633 [170 P.2d 893].)"

Under the rule stated in this case, a borrower may bring an action for usurious interest paid within two years of the suit. However, such borrower cannot claim three times the usurious interest paid unless an action therefor is commenced within a year after such payment. In the instant case Goodwin received $51,544.90 in payment of the $40,000 advanced. The trial court trebled the difference between these two amounts ($11,544.90) and charged Goodwin with the sum of $34,634.70. This was clearly error. No cause of action existed for the recovery of three times the usurious interest at the time the counterclaim was filed. Under such circumstances, the counterclaim fails to state a cause of action for the recovery of treble damages and this objection may be raised at any state of the proceeding. Section 3 of the Usury Act, *supra,* creates a right of action for a limited period and extinguishes it at the end of that period. The Flemings had no right of action for treble damages at the time of the filing of the answer and, consequently, no coun-

terclaim for treble damages. In this connection the record shows that all moneys received by Goodwin were from the sale of potatoes and not from the personal funds of the Flemings. While the jury found that the transactions involved were "loans," it does not appear from those findings whether the loans were to the Flemings or to the Alstons. It is significant that no note or written promise to pay Goodwin was executed by Flemings and it was understood that plaintiff would be repaid from the proceeds of potato crops.

Appellant next contends that the trial court erred in sustaining objections to certain questions asked on cross-examination of Fleming. The questions, answers and rulings thereon are set forth in the following testimony:

"Q. What interest did you have with Mr. Alston on that ranch? (Objection by counsel, Mr. Krieger.)

"The Court: I think your question asked not whether he borrowed the money with Mr. Alston or from Mr. Alston, but what the working arrangement was on the ranch. I don't think that is material.

"Q. Did you loan money to Mr. Alston?

"Mr. Krieger: I object to that as being incompetent, irrelevant and immaterial, and outside the issues.

"The Court: Sustained."

"Q. You just testified that you stated to Mr. Goodwin that 'we', that means you and Alston paid for the land $600.00 an acre. A. Yes, I furnishing the money.

"Q. When did you buy the land? A. Well, sometime prior to that. I don't exactly remember.

"Q. Did you and Alston buy it together?

"Mr. Krieger: I object to that. Now we are getting far afield again.

"The Court: Sustained. It is already asked and answered.

"Q. Did you buy it at the same time Alston bought it?

"Mr. Krieger: I object again. I object to it as incompetent, irrelevant and immaterial.

"The Court: Sustained."

"Q. What connection did Mr. Cornett have with that ranch at that time, if you know?

"Mr. Krieger: Objected to as incompetent, irrelevant and immaterial.

"The Court: Sustained."

"Q. Did you own all the potatoes that was going to come from that farm?

"Mr. Krieger: Objected to as calling for a conclusion of

the witness, and also not the best evidence for the reason that the order on the potatoes was drawn by Mr. Alston and that order is the best evidence.

"Mr. Feinfeld: I am asking if he owned all the potatoes.

"The Court: Overruled. You may answer. Read the question. (Question read.)

"The Court: You may answer. A. I did not.

"Q. How much did you own?

"Mr. Krieger: I object to that as being incompetent, irrelevant and immaterial.

"The Court: Sustained."

These questions were designed to develop the extent, if any, of the Flemings' interest in the real property owned of record by the Alstons and the Flemings' interest, if any, in the potato crops which were the source of all payments to plaintiff. These questions were pertinent to the issues involved and submitted to the jury and it was error to sustain objections to them.

An application to produce evidence here was filed by the appellant in which he sets forth portions of the deposition and the testimony taken February 15, 1952, both in the case of *Pacific Guano Co.* v. *Elwood Alston, M. A. Fleming,* in the Superior Court of Riverside County. It is claimed therein that the evidence sought to be introduced shows that M. A. Fleming did not, himself, borrow money from appellant Goodwin but furnished collateral security for a loan to Alston; that all the moneys paid to appellant were proceeds of a crop which was owned by Alston and not respondents and that respondent Fleming's testimony at the trial was in some respects false. Objections were filed by respondents to production of this evidence and since we conclude that the judgment must be reversed by reason of the errors of the trial court hereinbefore noted, it is not necessary to pass upon the application. The affidavit in support of the application does, however, demonstrate the seriousness of the error of the trial court in refusing to permit the witness Fleming to answer the quoted questions on cross-examination.

The judgment is reversed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied January 9, 1953, and respondents' petition for a hearing by the Supreme Court was denied February 10, 1953. Carter, J., was of the opinion that the petition should be granted.